UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- against -<br><br>ANDREW LAWRENCE,<br><br>                    Defendant. | **ORDER**<br><br>21 Cr. 127 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Andrew Lawrence is charged with felon in possession, in violation of

18 U.S.C. §§ 922(g).  He has moved to dismiss on the grounds that the grand jury venire that

returned the Indictment was not drawn from a fair cross-section of the community, in violation of

the Sixth Amendment and the Jury Selection and Service Act of 1968 (the "JSSA").  For the

reasons stated below, Lawrence's motion will be denied.

## BACKGROUND

I.    **FACTS**

On December 1, 2020, Lawrence was arrested in connection with an assault that

occurred several months earlier in the Bronx.  (Cmplt. (Dkt. No. 1) ¶¶ 1, 3-5)  In a search

incident to arrest, Lawrence was found to be in possession of a 9 mm. semi-automatic handgun.

(Id. ¶ 5(c))  In July 2015, Lawrence was convicted of attempted criminal possession of a

controlled substance with intent to sell in the third degree, in violation of N.Y. Penal Law §

220.16.  This offense is a felony.  (Id. ¶ 9)

On February 25, 2021, Lawrence was charged with knowing possession of a

firearm following a felony conviction, in violation of 18 U.S.C. §§ 922(g).  (Indictment (Dkt.

No. 5))

## II.   <u>DEFENDANT'S MOTION TO DISMISS</u>

On March 29, 2021, Defendant moved to dismiss, arguing that the grand jury that indicted him does not reflect a fair cross-section of the community, because Blacks and Latinos are underrepresented in the Southern District of New York's jury pool.  According to Lawrence, this alleged underrepresentation is a product of this District's juror selection process.  (See Def. Br. (Dkt. No. 13))  Lawrence contends that the juror selection process violates the Sixth Amendment and the JSSA.[1]   (Dkt. No. 12)

## III.   <u>THIS DISTRICT'S JUROR SELECTION PLAN</u>

The JSSA sets forth requirements that all federal district courts must follow in selecting jurors to serve on grand and petit juries.  The JSSA provides that

> all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. . . . [A]ll citizens shall have the opportunity to be considered for service on grand and petit juries . . . and shall have an obligation to serve as jurors when summoned for that purpose.  No citizen shall be excluded from service as a grand or petit juror . . . on account of race, color, religion, sex, national origin, or economic status.

28 U.S.C. §§ 1861-62.  The JSSA requires federal district courts to "devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve" the JSSA's objectives.  Id. § 1863(a).

Each district's juror selection plan must, <u>inter</u> <u>alia</u>,

(1) "establish a jury commission, or authorize the clerk of the court, to manage the jury selection process";

---

[1]  Lawrence's motion also asserts a violation of the Fifth Amendment's Equal Protection Clause, but Lawrence does not brief a Fifth Amendment claim.  (See Dkt. No. 12; Def. Br. (Dkt. No. 13) at 1)  "'Court[s] need not entertain an argument that was not briefed.'"  United States v. Middlebrooks, No. 21 CR. 89 (RMB), 2021 WL 2402162, at *2 n.3 (S.D.N.Y. June 10, 2021) (quoting Johannes Baumgartner Wirtschafts-Und Vermogensberatung GmbH v. Salzman, 969 F. Supp. 2d 278, 290 (E.D.N.Y. 2013)).

(2) "specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division . . . [and] prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title";

(3) "specify detailed procedures to be followed by the jury commission or clerk in selecting names [of prospective jurors that are] . . . designed to ensure the random selection of a fair cross section of the persons residing in the community in the district or division wherein the court convenes. They shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; and shall ensure that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions";

(4) "provide for a master jury wheel (or a device similar in purpose and function) into which the names of those randomly selected shall be placed. . . . The plan shall provide for periodic emptying and refilling of the master jury wheel at specified times, the interval for which shall not exceed four years";

(5) "specify those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service"; [and]

 . . .

(8) "specify the procedures to be followed by the clerk or jury commission in assigning persons whose names have been drawn from the qualified jury wheel to grand and petit jury panels."

Id. § 1863(b)(1)-(8).

        In accordance with the JSSA's requirements, this District established a juror selection plan in 1983. (See Am. Plan for the Random Selection of Grand and Petit Jurors in S.D.N.Y. (the "Jury Plan") (Dkt. No. 13-1) Article XII  Last amended in January 2009, the Jury Plan covers New York, Bronx, Westchester, Putnam, Dutchess, Sullivan, Orange, and Rockland counties, and provides that names shall be randomly selected from voter registration lists for these eight counties. (Id. Articles III(A), XIII)  The master jury wheel is emptied and refilled

"by not later than September 1 following the date of each Presidential Election." (<u>Id.</u> Article III(B))

The master jury wheel for the Manhattan courthouses includes residents from New York, Bronx, Westchester, Putnam, and Rockland counties; the master jury wheel for the White Plains courthouse includes residents from Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess counties. (<u>Id.</u> Article III(C))  Names are initially drawn from each county in numbers that "reasonably reflect the relative number of registered voters in each county within the respective Master Jury Wheels," and names are added to the master jury wheels "[f]rom time to time thereafter, as the Chief Judge directs," in the same random and proportional manner as the initial selection. (<u>Id.</u> Articles III(A)-(B))

"Once or twice each year, or more frequently, if necessary, at times to be determined by the Chief Judge, the Clerk shall draw from the Master Wheels the names and addresses of persons to whom questionnaires will be sent for the purpose of examining their qualifications and availability for jury service." (<u>Id.</u> Article III(D))  A person is qualified to serve on grand and petit juries unless he or she

(1) [i]s not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;

(2) [i]s unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(3) [i]s unable to speak the English language;

(4) [i]s incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

(5) [h]as a charge pending for the commission of, or has been convicted in a State or Federal court [of], a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

(<u>Id.</u> Article VII; <u>see also</u> 28 U.S.C. § 1865(b))

The following persons may be excused from jury service or deferred upon request:

(1) Persons over 70 years of age;

(2) Persons having legal custody and active daily care of a child or children under the age of 12 years; or who are essential to the daily care of aged or infirm persons;

(3) Persons who have satisfactorily served as grand jurors or as petit jurors in a State or Federal court within the past 4 years;

(4) Volunteer safety personnel who serve without compensation as firefighters or members of a rescue squad or ambulance crew for a public agency;

(5) Persons as to whom a judge finds, for reasons other than the foregoing, that jury service would constitute undue hardship or extreme inconvenience.

(Id. Article VI)

Based on questionnaires completed by prospective jurors, jury wheels are populated with the names and addresses of all eligible jurors and then separated into a Manhattan qualified wheel and a White Plains qualified wheel, using the same county divisions as the master wheels. (Id. Articles III(D), IV(B)) Jurors from Westchester, Putnam, and Rockland counties are "divided between" the Manhattan and White Plains qualified wheels in a manner that "reasonably reflect[s] the relative number of registered voters in each county within the respective Master Jury Wheels." (Id. Article IV(B)) At all times, the qualified wheels must contain at least 500 names. (Id. Article IV(A))

In selecting jurors for grand or petit jury panels, the Clerk of Court publicly draws from the qualified wheels, at random, the names of "as many persons as appear to be needed for grand or petit juries." (Id. Article IV(C)) The Clerk then "randomly assign[s] jurors to jury panels for individual trial parts and grand juries, as needed." (Id.) A summons is issued to each

selected person at that person's "usual residence or business address" by first class, certified, or registered mail.  (Id. Article IV(D))

## DISCUSSION

## I.    LEGAL STANDARDS

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community."  Berghuis v. Smith, 559 U.S. 314, 319 (2010).

> In Duren v. Missouri, 439 U.S. 357 . . . (1979), [the U.S. Supreme] Court described three showings a criminal defendant must make to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement.  He or she must show:  "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

Id. (quoting Duren, 439 U.S. at 364).

Under the JSSA, a "defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of [the JSSA] in selecting the grand or petit jury."  28 U.S.C. § 1867(a).  "The Duren test 'governs fair cross section challenges under both the [JSSA] and the sixth amendment.'"  United States v. Rioux, 97 F.3d 648, 660 (2d Cir. 1996) (quoting United States v. LaChance, 788 F.2d 856, 864 (2d Cir. 1986)) (alteration in Rioux).

"Mere 'technical' violations of the procedures prescribed by the [JSSA] do not constitute 'substantial failure to comply[.]' . . . Whether a violation is 'substantial' or merely 'technical' depends upon the nature and extent of its effect on the wheels and venire from which a defendant's grand jury was derived."  LaChance, 788 F.2d at 870 (citations omitted).

## II.   ANALYSIS OF THE *DUREN* FACTORS

The parties agree that the first prong of the <u>Duren</u> test is satisfied, because Blacks and Latinos are "distinctive" groups in the community.  (<u>See</u> Def. Br. (Dkt. No. 13) at 5; Govt. Opp. Br. (Dkt. No. 16) at 8)[2]  The Government argues that Lawrence has not established the second and third prongs of the <u>Duren</u> test, however, because Blacks and Latinos are not unfairly underrepresented "in relation to the number of such persons in the community," and any underrepresentation is due to external factors rather than a feature of the Jury Plan.  (Govt. Opp. Br. (Dkt. No. 16) at 8)

### A.   Second *Duren* Factor:  Underrepresentation

#### 1.   Significant Underrepresentation

To satisfy the second prong of the <u>Duren</u> test, "the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement."  <u>Duren</u>, 439 U.S. at 364.  "The relevant comparison, for purposes of assessing the representativeness of the system, would normally be between the number of minority persons in the population and the number of persons belonging to the class found in the jury pool."  <u>United States v. Jackman</u>, 46 F.3d 1240, 1246 (2d Cir. 1995).  Using these benchmarks, a court must determine whether the "'distinctive' groups are 'significant[ly] underrepresent[ed]' in the jury selection process."  <u>Id.</u> (citing <u>United States v. Biaggi</u>, 909 F.2d 662, 677 (2d Cir. 1990)).

---

[2]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

### a.    Percentage of Black and Latino Persons
### in the Relevant Community Population

The parties agree that the relevant "community population" includes United States citizens who are eighteen years of age and older, and who reside in the counties from which the Manhattan master and qualified wheels are populated.  (See Martin Decl. (Dkt. No. 13-2) ¶¶ 13, 22; Siskin Rpt. (Dkt. No. 16-1) ¶¶ 3, 20–21, 45)  Defendant relies on five-year average data from the 2019 American Community Survey ("ACS"); the data indicate that the relevant community population is 21.19% Black and 28.44% Latino.  (Def. Br. (Dkt. No. 13) at 7; Martin Decl. (Dkt. No. 13-2) ¶¶ 23, 25)  The Government relies on 2019 ACS data for one year, which shows that the relevant community population is 21.80% Black and 29.29% Latino.  (Govt. Opp. Br. (Dkt. No. 16) at 9; Siskin Rpt. (Dkt. No. 16-1) ¶¶ 8, 20-21)

### b.    Relevant Jury Pool

"The relevant jury pool may be defined by:  (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three."  Rioux, 97 F.3d at 657.

Defendant asserts that the Manhattan qualified wheel is the relevant jury pool. (Def. Reply Br. (Dkt. No. 19) at 5-6)  While Defendant's "allegations target both the master and qualified wheels," he contends that the qualified wheel is more pertinent because (1) "any defect[s] in the master wheel [are] – by design – passed on to the qualified wheel"; and (2) "the qualified wheel is the first level of the Southern District's jury selection process for which [the parties] have reliable demographic data, i.e., the information at the heart of this challenge."  (Id. at 5)

The Government asserts that this Court should consider both the Manhattan master wheel and qualified wheel as the relevant jury pools, because Defendant's allegations relate to the processes used to populate both wheels.  (Govt. Opp. Br. (Dkt. No. 16) at 11-12)

Defendant contends that three factors lead to underrepresentation of Blacks and Latinos in the Manhattan master wheel:  (1) the use of voter registration lists to create the master wheel; (2) the exclusion of so-called "inactive" voters, who are individuals "still registered to vote but whose status is changed to 'inactive' because the county elections boards have received information, whether accurate or not, that the voter has moved"; and (3) the re-population of the master wheel every four years, which excludes persons who (a) are not eighteen years old when the master wheel is re-populated, but who are eighteen or older by the end of the master wheel's four-year re-population cycle, and (b) moved into or within relevant counties during the master wheel's four-year re-population cycle.  (See Def. Br. (Dkt. No. 13) at 15; Def. Reply Br. (Dkt. No. 19) at 8-9; Martin Decl. (Dkt. No. 20-1) ¶¶ 77, 82, 106-08)[3]  As to the qualified wheel, Defendant cites two additional factors:  (1) no attempt is made to reach jurors whose questionnaires are returned as undeliverable[4]; and (2) no attempt is made to reach jurors whose questionnaires go unanswered for any other reason.  (Def. Reply Br. (Dkt. No. 19) at 9; Martin Decl. (Dkt. No. 20-1) ¶¶ 112-14, 118-19)

Given that Defendant's allegations are directed at both the Manhattan master and qualified wheels, the Court will consider both wheels in addressing Defendant's motion to dismiss.  See United States v. Allen, 20-cr-366 (NSR), 2021 WL 431458, at *5 (S.D.N.Y. Feb. 8, 2021) ("[T]he Court finds that the proper jury wheel is both the White Plains master wheel and

---

[3]  Defendant submits a "slightly more expansive" version of the Martin declaration in connection with his reply brief.  (See Def. Reply Br. (Dkt. No. 19 at 5 n.3; Martin Decl. (Dkt. No. 20-1))

[4]  Defendant's expert notes that "[t]here are many categories that the United States Postal Service tracks for undeliverable mail[,]" including "Change of Address, Box Closed – No Order, Moved left no Address, Temporary COA [Change of Address], Attempted not Known, In Dispute, Insufficient Address, Illegible, No Mail Receptacle, No such Number, Deceased, Not Deliverable as Addressed/Unable to Forward/Forwarding order expired, Refused, No such Street, Unclaimed, and Vacant."  (Martin Decl. (Dkt. No. 20-1) ¶ 115)

the Whites Plains qualified wheel . . . because Defendants aver that systematic selection issues impact both the master wheel and the qualified wheel.") (emphasis in original).

The parties agree that the relevant population for purposes of the Manhattan qualified wheel is 16.08% Black and 19.41% Latino.  (Def. Br. (Dkt. No. 13) at 7; Govt. Opp. Br. (Dkt. No. 16) at 12; Martin Decl. (Dkt. No. 13-2) ¶ 28; Siskin Rpt. (Dkt. No. 16-1) ¶¶ 3, 18)

As to the Manhattan master wheel, the Government asserts that there is no "reliable information" establishing the demographics, but contends that "the racial and ethnic makeup of the Manhattan Master Wheel can be estimated using geocoding and Bayesian Improved Surname Geocoding ('BISG')."[5]  (Govt. Opp. Br. (Dkt. No. 16) at 12)

---

[5]  Dr. Bernard Siskin, the Government's expert, describes his use of geocoding as follows:

> Geocoding is based on estimating the proportion of persons who are of a given race based on the racial mix of the area in which they live.  In defining where they live, I used the residence address on the voter registration list.  Conceptually, geocoding uses the racial/ethnic mix of the area where one resides to estimate the race of persons on the list from that area.  That is, if 100 persons on the master jury wheel live in an area in which 85% of the voter age U.S. citizens are African American, then we would estimate that 85 of these 100 are African American, and 15 are not.  Assuming that the probability of being randomly selected for the master jury wheel if you live in that area is the same for everyone, this estimate will be very reliable, especially if we are selecting large numbers of persons.  The more homogeneous the areas defined for the geocoding, the more accurate the estimate of the race of the wheel will be.  To maximize accuracy of the geocoding, I defined the area as the census tract, which is the smallest area for which information about the race of voter age U.S. citizens was available.  The smaller the area, and the more homogeneous the area, the more accurate the geocoding estimate.  I defined the population in the census tract as U.S. citizens of voting age.  To estimate the percent Hispanic, the commonly used methodology is the Bayesian Improved Surname Geocoding (BISG) method, which enhances the accuracy of the geocoding by also using information about the ethnicity of a person's last name.  This method has been shown to significantly improve the estimate for Hispanic ethnicity compared to regular geocoding.

(Siskin Rpt. (Dkt. No. 16-1) ¶ 28)

As the Defendant points out, however, geocoding overestimates the number of Black and Latino individuals by .22% and 2.69%, respectively, for purposes of the Manhattan master wheel, and it is not possible to "test the accuracy of geocoding for the entire master wheel because [the parties] do not have confirmatory demographics for the entire wheel."[6]  (Def. Reply Br. (Dkt. No. 19) at 6; Martin Decl. (Dkt. No. 20-1) ¶ 101)

Accordingly, for purposes of establishing the relevant demographics, the Court will rely primarily on the Manhattan qualified wheel.

### c.    <u>Method of Determining Underrepresentation</u>

The Supreme Court has not specified a "method or test courts must use to measure the representation of distinctive groups in jury pools," but "three methods [have been] employed or identified in lower federal court decisions:  absolute disparity, comparative disparity, and standard deviation."  <u>Berghuis</u>, 559 U.S. at 329 (citations omitted).

---

[6]  Dr. Siskin acknowledges a

constraint on the accuracy of the geocoding methodology.  The basic assumption is that if the potential voting eligible population (U.S. citizens of voting age) in a census tract is 85% African American, then we would expect 85% of those on the master jury wheel who reside in that census tract to be African American.  However, since the master jury wheel is selected from registered voters and not from potentially voting-eligible persons, this assumes that the likelihood of registering to vote for those who live within the same census tract is the same by race.  For Hispanics we assume that Hispanic and non-Hispanics persons living in the same census tract and with an equally likely Hispanic surname are equally likely to register to vote.  If under these constraints African Americans and/or Hispanics are less likely to register to vote, the results of the geocoding will overestimate the percent of African Americans and Hispanics on the master jury wheel.  However, there is no valid statistical evidence to conclude there is such a difference.  There is no way to assess the accuracy of the 2017 ACS as an estimate of the voting eligible population as of November 1, 2016.

(Siskin Rpt. (Dkt. No. 16-1) ¶ 29)

Standard deviation theory operates by "calculat[ing] probabilities and measur[ing] the likelihood that underrepresentation could have occurred by sheer chance.  Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is an imperfection in the jury selection system."  Rioux, 97 F.3d at 655.

Comparative disparity "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service.  Comparative disparity is calculated by dividing the 'absolute disparity' of a group . . . by the groups percentage of the population, and then multiplying by 100%."  Id. (internal quotation marks and citation omitted).

The "absolute disparity method"

> measures the difference between the group's representation in the general population and the group's representation in the qualified wheel.  For example, if Blacks compose 10% of the entire population but only 2% of the qualified wheel, the absolute disparity is 8%.  The absolute numbers approach then measures how many persons of the group you would have to add to a venire to ensure adequate representation.  The absolute numbers approach is the average difference in the number of jurors per venire due to the underrepresentation.  Using our example, if the absolute disparity of Blacks is 8%, between four and five Blacks would have to be added to a jury pool of 60 persons to ensure adequate representation (8% of 60 = 4.8).

Id.

"Each test is imperfect."  Berghuis, 559 U.S. at 329.  Absolute disparity and comparative disparity measurements, for example, "can be misleading when . . . members of the distinctive group comp[ose] [only] a small percentage of those eligible for jury service."  Id. (internal quotation marks and citation omitted) (alterations in original).  Moreover, "'[n]o court . . . has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems.'"  Id. (quoting Rioux, 97 F.3d at 655) (alterations in Berghuis).

Here, Defendant does not advocate for any particular method of determining Black and Latino representation.  Instead, he argues that "[r]egardless of the method of analysis used, Black and Latino individuals are significantly underrepresented in the Manhattan qualified jury wheel."  (Def. Br. (Dkt. No. 13) at 6)  The Government contends that this Court should utilize the absolute disparity method.  (Govt. Opp. Br. (Dkt. No. 16) at 13)

The Second Circuit has "considered and rejected the comparative disparity test," Rioux, 97 F.3d at 655, and, as noted, use of the standard deviation analysis alone is not generally accepted.  Berghuis, 559 U.S. at 329.  Numerous courts in this District have concluded that "[t]he 'primary approach used in [the Second] Circuit' is the absolute disparity method."  United States v. Schulte, No. S3 17 CR. 548 (PAC), 2021 WL 1146094, at *7 (S.D.N.Y. Mar. 24, 2021) (quoting United States v. Barnes, 520 F. Supp. 2d 510, 514 (S.D.N.Y. 2007)); see also United States v. Scott, 20 Cr. 332 (AT), 2021 WL 2643819, at *8 (S.D.N.Y. June 28, 2021) ("[I]n the Second Circuit, the absolute disparity method is the favored approach for Sixth Amendment claims." (citing Rioux, 97 F.3d at 655-56)); Allen, 2021 WL 431458, at *8 ("The absolute disparity method . . . appears to be the preferred method for analyzing jury underrepresentation under the Sixth Amendment in the Second Circuit." (citing Rioux, 97 F. 3d at 655; Biaggi, 909 F. 2d at 678; United States v. Jenkins, 496 F.2d 57, 66 (2d Cir. 1974)).  Given these precedents, this Court will utilize the absolute disparity method.

In using this method of analysis, this Court must consider what level of underrepresentation is sufficient to constitute a violation of the Sixth Amendment's fair cross-section requirement.  While no specific threshold has been established, the Second Circuit has found absolute disparities up to five percent to be constitutionally insignificant.  See, e.g., United States v. Ramnath, 131 F.3d 132 (2d Cir. 1997) (unpublished table decision) (finding absolute

13

disparities of 3.45% for Blacks and 4.87% for Latinos did not violate the fair cross-section requirement); Rioux, 97 F.3d at 657-58 (finding absolute disparities up to 2.14% did not violate fair cross-section requirement); Biaggi, 909 F.2d at 667-78 (finding absolute disparities of 3.6% for Blacks and 4.7% for Latinos did not violate fair cross-section requirement).

        In Biaggi, however, the Second Circuit stated that absolute disparities of 3.6% for Blacks and 4.7% for Latinos "press[ed] . . . the 'absolute numbers' approach to its limit," and noted that it "would find the Sixth Amendment issue extremely close if the underrepresentations had resulted from any circumstance less benign than the use of voter registration lists." Biaggi, 909 F.3d at 678. And in Jackman, the Second Circuit found that absolute disparities of 2.5% for Blacks and 3.4% for Latinos constituted a "significant level of underrepresentation," given that "[t]he facts [of that] case reveal[ed] circumstances far less benign than those in Biaggi. . . ." Jackman, 46 F.3d at 1247-48. There, the jury clerk had continued using a juror selection procedure for more than a year after a Connecticut district court determined that the procedure violated the Sixth Amendment. Id. at 1247 (citing United States v. Osorio, 801 F. Supp. 966 (D. Conn. 1992)).

### d.      **Application of the Absolute Disparity Method**

        Applying the absolute disparity approach to the circumstances here, there is an absolute disparity of 5.11% for Blacks and 9.03% for Latinos in the Manhattan qualified wheel, using the five-year ACS numbers. (Def. Br. (Dkt. No. 13) at 7; Martin Decl. (Dkt. No. 13-2) ¶¶ 33-34) Using the one-year ACS numbers, the absolute disparities for the Manhattan qualified wheel are slightly higher: 5.72% for Blacks and 9.88% for Latinos. (Govt. Br. (Dkt. No. 16) at 10-11; Siskin Rpt. (Dkt. No. 16-1) ¶¶ 3, 43) The absolute disparity for the Manhattan master

wheel is 1.34% for Blacks and 0.04% for Latinos.  (Govt. Opp. Br. (Dkt. No. 16) at 15; Siskin Rpt. (Dkt. No. 16-1) ¶¶ 8, 30, 43)

Defendant contends that the absolute disparities for the qualified wheel "cross[] the threshold hinted at by the Second Circuit" in Biaggi.  (Def. Br. (Dkt. No. 13) at 7-8)  He further asserts that the causes of these disparities "have been known since at least 1996" (id. at 10-11), when Judge Scheindlin considered a similar challenge to the Jury Plan.  See United States v. Reyes, 934 F. Supp. 553, 565-66 (S.D.N.Y. 1996) (finding that absolute disparities of up to 4.03% for Blacks and Latinos did not violate the Sixth Amendment, but noting that "serious consideration should be given to amending the jury selection procedures in the Southern District of New York").  Given that it has been known for at least twenty-five years that use of this District's Jury Plan creates disparities, Defendant argues that the failure to modify the Jury Plan "weighs against a finding of 'benign' circumstances that might excuse a significant underrepresentation."  (Def. Br. (Dkt. No. 13) at 11)

The Government concedes that "the Second Circuit has not specifically approved a disparity as high as 9.88%," but argues that "courts [in other circuits] have repeatedly found disparities up to and exceeding that number to be acceptable. . . ."  (Govt. Opp. Br. (Dkt. No. 16) at 15)  The Government further contends that when the absolute disparities of the Manhattan master and qualified wheels are considered together – given the benign circumstances presented here – "the defendant has failed to establish significant underrepresentation."  (Id.)

As discussed above, the Manhattan master wheel disparities are less probative than the qualified wheel disparities, because reliable information concerning the demographics of the master wheel is not available, and techniques such as geocoding have limited utility. Moreover, the absolute disparities for the Manhattan qualified wheel are higher – and for

15

Latinos, significantly higher – than disparities the Second Circuit has found to constitute a significant level of underrepresentation.  See Jackman, 46 F.3d at 1248.

Defendant argues that these disparities should not be discounted as "benign," because it has been known since the 1996 Reyes decision that use of the Jury Plan results in underrepresentation of Blacks and Latinos.  But it is worth noting that in Reyes, Judge Scheindlin rejected the defendants' fair cross-section challenge, finding that the absolute disparities in that case were "not so great as to constitute a violation of the Sixth Amendment." Reyes, 934 F. Supp. at 566.

This Court makes no finding concerning the second Duren factor because – as discussed below – Defendant has not satisfied the third Duren factor.

**B.     Third *Duren* Factor:  Systematic Exclusion**

As to the third Duren factor, "[t]here is systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces." Rioux, 97 F.3d at 658.  A defendant cannot "make out a prima facie case merely by pointing to a host of factors that, individually or in combination, might contribute to a group's underrepresentation[,]" however.  Berghuis, 559 U.S. at 332 (emphasis in original).  Moreover, "systematic exclusion does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group."  United States v. Barlow, 732 F. Supp. 2d 1, 40 (E.D.N.Y. 2010), aff'd, 479 F. App'x 372 (2d Cir. 2012).

Citing Biaggi and Duren, Lawrence contends that "[a] defendant may establish that the underrepresentation of a distinctive group is due to systematic exclusion by showing that the underrepresentation occurred[, as here,] over a significant time period."  (Def. Br. (Dkt. No. 13) at 8-10 (showing an increase in absolute disparity for Latinos from 0.11% in 2011 to 9.07%

in 2019); see also Martin Decl. (Dkt. No. 13-2) ¶¶ 46-52).  The Government responds that "[t]his argument improperly attempts to bootstrap a showing on the second Duren prong into a showing on the third."  (Govt. Opp. Br. (Dkt. No. 16) at 22-23)

In Duren, the Supreme Court found that the underrepresentation of women in the Jackson County, Missouri jury pool was the result of systematic exclusion.  In that case, there was an "undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year," which "manifestly indicate[d] that the cause of the underrepresentation was systematic. . . ."  Duren, 439 U.S. at 366.  The Duren court did not rely on the duration of the discrepancy alone, however.  The Court also found that petitioner had independently "demonstrated that the underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria . . . as implemented in Jackson County."  Id. at 366-67.

And in Biaggi, the Second Circuit rejected defendant's Sixth Amendment claim, finding that the absolute disparities at issue were not constitutionally significant.  See Biaggi, 909 F.2d at 678.  While the court commented that it may have found the disparities at issue to be significant if they "had resulted from any circumstance less benign than the use of voter registration lists[,]" the court did not explicitly address whether the disparities were caused by systematic exclusion, much less whether a finding of systematic exclusion can be premised on a disparity that has persisted over an extended period of time.  See id.

As discussed above, Defendant contends that the Jury Plan results in the systematic exclusion of Blacks and Latinos because

> [f]irst, it draws it[s] master wheel exclusively from voter registration rolls, which underrepresent the number of jury-eligible Black and Latino New Yorkers. . . . Second, the District only refills its master wheel every four years, which arbitrarily removes jury-eligible 18-21 years olds from the prospective jury pool,

. . . and elevates those with stable housing over those without it, [and] . . . Black and Latino voters are overrepresented in both of these categories in comparison to their white peers. . . . Third, the Southern District chooses to remove inactive voters from the wheel, which again disparately impacts Black and Latino individuals. . . . Fourth . . . , the jury administrator fails to attempt to reach jurors who do not respond to . . . questionnaires [that are deemed undeliverable. Fifth, the jury administrator does not attempt to contact jurors who do not respond to questionnaires] for any other reason.

(Def. Reply Br. (Dkt. No. 19) at 8-9 (citing Martin Decl. (Dkt. No. 20-1) ¶¶ 82, 106-08, 112-14, 118))

The Government's expert, Dr. Bernard Siskin, analyzed the causes cited by the Defendant and quantified the effects of these practices on the number of Blacks and Latinos in the Manhattan master and qualified wheels.[7]  (Id.)  Dr. Siskin made the following findings:

the use of voter registration lists alone to construct the master wheel results in a 0.70% underrepresentation of Blacks and a 1.34% overrepresentation of Latinos in the master wheel.  (Siskin Rpt. (Dkt. No. 16-1) ¶¶ 33, 43); see also Govt. Opp. Br. (Dkt. No. 16) at 18);

refilling the master wheel at four-year intervals results in a 0.32% underrepresentation of Blacks and a 0.71% underrepresentation of Latinos in the master wheel (id. ¶ 31);

the exclusion of inactive voters results in a 0.18% underrepresentation of Blacks and a 0.26% underrepresentation of Latinos in the master wheel.  (Id. ¶ 35)

Considered together, these three factors result in a 1.2% underrepresentation of Blacks (0.70% + 0.32% + 0.18%) and a 0.37% overrepresentation of Latinos in the master wheel (1.34% - (0.71% + 0.26%)).

The Court concludes that Defendant has not shown that these three practices – the use of voter registration lists, refilling the master wheel at four-year intervals, and the exclusion of inactive voters – cause a significant level of Black and Latino underrepresentation in the Manhattan master wheel.  Moreover, these practices are facially neutral, and as noted above,

---

[7]  Defendant's expert conducted no such analysis.

"systematic exclusion does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group." Barlow, 732 F. Supp. 2d at 40; see also Scott, 2021 WL 2643819, at *9 (concluding that "use of voter registration lists, refilling the master wheel every four years, . . . [and] Inactive Voter Exclusion" are "facially neutral"). And although the demographics of the master wheel are less reliable than those of the qualified wheel – given that the level of underrepresentation of Blacks is minimal, and that these practices result in a slight overrepresentation of Latinos – the Court concludes that Defendant has not shown systematic exclusion. See also Middlebrooks, 2021 WL 2402162, at *3 (concluding that use of voter registration lists, refilling the master wheel every four years, and excluding inactive voters do not violate the Sixth Amendment's fair cross-section requirement); accord United States v. Segovia-Landa, 20-CR-287 (JPO), 2021 WL 1966117, at *2 (S.D.N.Y. May 17, 2021); United States v. Tagliaferro, 19-CR-472 (PAC), 2021 WL 1172502, at *4 (S.D.N.Y. Mar. 29, 2021); Schulte, 2021 WL 1146094 at *8-9.

As to the fourth and fifth causes cited by Defendant – that the jury administrator does not attempt to contact jurors whose questionnaires are deemed undeliverable or who do not respond to their questionnaires for any other reason – Dr. Siskin found that Blacks and Latinos are "significantly less likely to return the questionnaire, and/or more likely to be found not qualified as a juror when they return the questionnaire, and/or they are more likely to be excused when found qualified, and, hence, [they] . . . are less likely to be moved from the master jury wheel onto the qualified jury wheel." (Siskin Rpt. (Dkt. No. 16-1) ¶ 39) Considered together, these factors result in a 4.40% underrepresentation of Blacks and a 9.80% underrepresentation of Latinos in the qualified wheel, and constitute the "dominant cause of the difference between the qualified jury wheel . . . and the community." (Id.)

To differentiate among potential jurors who (1) did not return the questionnaire, (2) were deemed not qualified, (3) were excused, or (4) did not receive the questionnaire, Dr. Siskin "computed via geocoding the percentages of African Americans and Hispanics . . . eliminated . . .  from being included on the qualified jury wheel" and the status codes assigned to the eliminated jurors.  Dr. Siskin "grouped the codes into the following categories:  deemed not qualified, excused, exempt[,] questionnaire not deliverable, and no response to questionnaire sent."  (Id. ¶ 40)

Of those sent a questionnaire who were eliminated from the qualified jury wheel, the majority did not return the questionnaire.  Indeed, Dr. Siskin found that "the 'no response' category makes up more than half of the persons sent a questionnaire."  (Id.)  Blacks and Latinos disproportionately fall into the "no response" category.  While Blacks represent 20.48% of those sent a questionnaire, they account for 23.21% of those who did not respond to the questionnaire. Similarly, while Latinos represent 29.51% of those sent a questionnaire, they account for 33.20% of those who did not respond to the questionnaire.  (Id.)

Dr. Siskin also found that 7.4% of questionnaires were returned as undeliverable. Questionnaires sent to Blacks were more likely to be undeliverable – 21.34% versus an expected 20.48% – while those sent to Latinos were less likely to be undeliverable – 28.74% versus an expected 29.51%.  (Id.)

Based on Dr. Siskin's findings, the Government argues that recipients' failure to respond to the questionnaires "is the primary reason for the disparity at this stage of the process." (Govt. Opp. Br. (Dkt. No. 16) at 19-20)  The Government further contends that the disparity "is not explained by the fact that Blacks and/or Hispanics may move more frequently[,] . . . because . . . only 7.4% of all Qualification Questionnaires were undeliverable, with Blacks only slightly

more likely [than other races] to have their questionnaires returned as undeliverable and Hispanic[s] slightly <u>less</u> likely to have their questionnaires returned as undeliverable."  (<u>Id.</u> at 20) (emphasis in original)  The Government also contends that where juror questionnaires are undeliverable or are intentionally not returned by recipients, such circumstances constitute forces outside the jury system, such as demographic change and individual choice.  (<u>Id.</u> at 21)

Defendant responds that "any cause of underrepresentation the government labels an 'external factor' can easily also be viewed as <u>internal</u>.  For example, the fact that so many juror questionnaires go unanswered can be . . . viewed as a result of [internal factors, such as] the choice to only update the master wheel every four years, which inevitably creates a pool riddled with ghost addresses, and . . . the choice not to follow-up with non-responsive questionnaire recipients or replace those with other eligible jurors in the same zip code."  (Def. Reply Br. (Dkt. No. 19) at 9) (emphasis in original)  Defendant further contends that "[t]he government and its expert . . . cite no data or support for th[e] conclusion" that the "no response" category represents "questionnaires that were in fact delivered to the intended addressee and not responded to by choice."  (<u>Id.</u> at 11)

The Court concludes that Defendant has not shown that these causes of underrepresentation are "due to the system of jury selection itself."  <u>Rioux</u>, 97 F.3d at 658.

Where questionnaires are undeliverable or are intentionally not returned by recipients, such circumstances are not the result of systematic exclusion.  A recipient's decision not to complete and return the juror questionnaire is plainly a factor external to the juror selection process.  As to questionnaires that are returned as undeliverable, the Second Circuit has held that "[t]he inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic

changes."  Rioux, 97 F.3d at 658; see also Middlebrooks, 2021 WL 2402162, at *3 (same);

Tagliaferro, 2021 WL 1172502, at *4 ("[Defendant's] qualms with . . . the practice of mailing

juror questionnaires must also fail under Rioux's external forces principle . . . [because] the

cause of the exclusion (e.g. people moving) is an external force, not an inherent flaw within the

Jury Plan.").  Moreover, Defendant has not provided "evidence that moving disparities did, in

fact, cause the underrepresentation" or that questionnaires were undeliverable "'due to the

system itself [rather than] outside forces.'"  Allen, 2021 WL 431458, at *10 (quoting Rioux, 97

F.3d at 658).

   Because Defendant has not satisfied the third element of the Duren test, his Sixth

Amendment claim will be denied.

   **C.**  **JSSA Challenge**

   Defendant contends that his right under the JSSA to a grand jury drawn from a

fair cross-section of the community was violated.  (Def. Br. (Dkt. No. 13) at 12)  As Defendant

acknowledges, however, the Duren test governs fair cross-section challenges under both the

Sixth Amendment and the JSSA.  (Id. at 13 (citing Rioux, 97 F.3d at 660))  Accordingly,

Defendant's JSSA fair cross-section claim fails for the same reasons that his Sixth Amendment

claim fails.

   Defendant also asserts a JSSA violation premised on the practice of excluding

from the Manhattan qualified wheel (1) "inactive" voters – those who are still registered to vote

but have moved, according to information received by the county elections boards; and (2)

registered voters with alternate mailing addresses in Putnam County.  Defendant contends that

these practices constitute "substantial failure[s] to comply" with the JSSA.  (Id. at 14-16; see also

LaChance, 788 F.2d at 870)

As discussed above, only substantial violations of the JSSA are actionable. "Whether a violation is 'substantial' or merely 'technical' depends upon the nature and extent of its effect on the wheels and venire from which a defendant's grand jury was derived." LaChance, 788 F.2d at 870.

The New York Election Law sets forth procedures for changing a registered voter's status from "active" to "inactive." See Common Cause/N.Y. v. Brehm, 432 F. Supp. 3d 285, 287-91 (S.D.N.Y. 2020) (summarizing procedures by which registered voters are deemed "inactive" in context of Fourteenth Amendment challenge to New York election practices). Once a New York resident registers to vote, the resident is

> listed as an active voter. Assuming they continue to satisfy various criteria . . . and the State receives no information suggesting that the voter has moved, the voter will remain in active status. . . .
>
> Voters are moved to inactive status when a County Board receives information indicating that a voter may no longer be living at her address of registration. New York relies on five proxies, or triggering events, to move voters to inactive status. First, voters are marked inactive if any mail sent by a County Board to a voter is returned as undeliverable. . . . Second, a third-party vendor may match a voter-registration record to a record in the National Change of Address registry, thus indicating the voter has moved. . . . Third, another state may inform New York election officials that a voter has moved. . . . Fourth, one New York county may inform another New York county that a voter has moved. . . . Fifth, certain information from the Department of Motor Vehicles regarding a change in address can also suffice. . . .
>
> As soon as any of these triggering events occur, County Boards take two steps. They send the voter a confirmation notice, advising the voter that the Board thinks she has moved and asking her to confirm her current address. . . . The confirmation notice is forwardable and serves as a "double check" on whether the voter has moved. . . . At the same time, the County Board moves the voter to inactive status. . . .
>
> Voters can get off inactive status in a few ways. A voter can reply to the confirmation notice, indicating either that she continues to reside at the same address or that she has moved. . . . A voter can also cast a valid affidavit ballot . . . . If an inactive voter fails to vote in two successive federal general elections (a period of four years), the state cancels their voter registration.

Id. at 289-91 (citing N.Y. ELEC. LAW §§ 4-117, 5-213, 5-712).

Defendant argues that exclusion of "inactive voters" constitutes a "substantial violation" of the JSSA because it contravenes (1) the JSSA's requirement that juror selection plans draw from voter registration lists; and (2) the JSSA's policy "that all citizens shall have the opportunity to be considered for service on grand and petit juries" in federal district courts. (Id. at 15-16 (citing 28 U.S.C. §§ 1861, 1869(c))  According to Defendant, 304,884 people were excluded because they were deemed "inactive."  (Id. (citing Martin Decl. (Dkt. No. 13-2) ¶ 64))

The JSSA requires that a district's juror selection plan "specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division." 28 U.S.C. § 1863(b)(2).  This District's Jury Plan states that prospective jurors are selected from voter registration lists. (Jury Plan (Dkt. No. 13-1) Article III(A))  Contrary to Defendant's argument, the JSSA does not prohibit the exclusion of individuals based on information indicating that their addresses are inaccurate.

The JSSA's "legislative history explains that the statute expresses a preference for the use of voter registration lists because '[t]hese lists provide the widest community cross section of any list readily available,' whereas '[c]ensus data quickly become out of date and are not suitable.'" United States v. Miller, 116 F.3d 641, 656 (2d Cir. 1997) (quoting H.R. REP. NO. 90-1076 (1968), as reprinted in 1968 U.S.C.C.A.N. 1792, 1794)).  In other words, Congress selected voter registration lists because they constitute the broadest and most accurate list of persons suitable for federal jury service.  The Jury Plan's exclusion of persons whose address information appears to be outdated is entirely consistent with that objective.

24

Moreover, the exclusion of inactive voters does not violate the JSSA's policy that all U.S. citizens be afforded the opportunity to be considered for service on petit and grand juries. The JSSA explicitly permits limiting jury pools to those who (1) are registered to vote or (2) have actually voted, and, as discussed, Congress selected voter registration lists as an appropriate source of potential jurors because of their breadth and tendency to reflect current information. The exclusion of individuals who have moved from their address of registration serves the broader purpose of the JSSA. See Allen, 2021 WL 431458, at *10 ("It is entirely logical for a jury selection process to exclude individuals who have since moved."); accord Scott, 2021 WL 2643819, at *15; Middlebrooks, 2021 WL 2402162, at *4; Tagliaferro, 2021 WL 1172502, at *5; Schulte, 2021 WL 1146094, at *10. Accordingly, the exclusion of "inactive voters" does not violate the JSSA.

With respect to voters who list alternate mailing addresses in Putnam County, Defendant asserts that

> in the process of selecting persons from the voter registration lists of Putnam County, the alternate mailing address was not successfully transferred to the Master Jury Wheel. Specifically, persons from Putnam County with an alternate mailing address, including a Zip Code, in the voter registration lists do not have a Zip Code in the Master Jury Wheel for the address used for qualification questionnaires and summonses. Many alternate mailing addresses are Post Office Boxes and so require a Zip Code for delivery. None of the persons on the Master Jury Wheel for the Manhattan Division from Putnam County who had an alternate mailing address were added to the Qualified Jury Wheel.

(Martin Decl. (Dkt. No. 13-2) ¶¶ 65-66)

Defendant argues that, as a result of this "technical glitch," 3,333 Putnam County voters with alternate addresses were not added to the master wheel. According to Defendant, this omission "is no small or 'technical' matter." (Def. Br. (Dkt. No. 13) at 16; Martin Decl. (Dkt. No. 13-2) ¶ 67) But the master wheel contains the names of 2,569,803 people. (Martin

Decl. (Dkt. No. 13-2) ¶ 68)  In this context, the exclusion of 3,333 people has a negligible effect

on the master and qualified wheels.  (See Siskin Rpt. (Dkt. No. 16-1) ¶¶ 38, 43 (concluding that

correction of this error would only "trivially increase the number of persons on the qualified jury

wheel, and trivially lower the percent of" Blacks and Latinos on the qualified wheel))  The Court

concludes that this alleged exclusion constitutes only a technical violation of the JSSA.  See also

Allen, 2021 WL 431458, at *11 (concluding that the "clerical issue involving improperly

transcribing alternate addresses of individuals to the master wheel is a technical violation of the

JSSA"); accord Scott, 2021 WL 2643819, at *17; Middlebrooks, 2021 WL 2402162, at *4;

Schulte, 2021 WL 1146094, at *10.

Accordingly, the Defendant's JSSA claims will be denied.

## CONCLUSION

For the reasons stated above, Defendant Lawrence's motion to dismiss is denied.

The Clerk of Court is directed to terminate the motion (Dkt. No. 12).

Dated:  New York, New York
         August 9, 2021

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge