**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

July 28, 2022

**BY ECF**
Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York NY 10007

Re:   **United States v. Andrew Lawrence**
          **21 Cr. 127 (PGG)**

Dear Judge Gardephe,

      Andrew Lawrence's arrest in this case was a serious wake-up call: "[i]t has motivated Andrew like never before." Exhibit C, Letter from Mother Crystal Lewis. Mr. Lawrence realized that he had to make changes in his life – changes that would ensure he never committed a crime again. And he made those changes. For the last 18 months, Mr. Lawrence has changed his patterns; he stopped hanging out with the people with whom, and in the neighborhood in which, he was getting in trouble; he has scrupulously followed the rules of his pre-trail release; he has dedicated himself to being a devoted and present step-father, partner, and son; and he is now gainfully employed. Mr. Lawrence is determined to make more of himself: "He is better than his criminal actions in this case, and he is working hard to prove to himself and everyone that he is." Exhibit B, Letter from Girlfriend Khiabet Falu. Mr. Lawrence has both the internal strength and the external support from his family to ensure that this change is permanent.

      On December 3, 2021, Mr. Lawrence pled guilty to a one count indictment, for violating 18 U.S.C. § 922(g)(1). The Court characterized the moment of his plea as a "critical juncture" in Mr. Lawrence's life, where he could make serious choices about his future: "It's either going to be you go to prison or you go in a different direction. It's that stark. It's going to go one way or the other, and it's largely up to you." See Plea Transcript, Dkt. No. 36. Mr. Lawrence has taken that statement to heart. Mr. Lawrence has now shown that the Andrew Lawrence who will stand before you at sentencing is a person who is focused on a productive, law-abiding, family-oriented life.

      Incarceration of any length would halt Mr. Lawrence's forward progress and would be greater than necessary to achieve the statutory goals of sentencing. See 18 U.S.C. § 3553(a). Moreover, a non-incarceratory sentence is an appropriate variance from the applicable guidelines range of 12 to 18 months. Mr. Lawrence is on the right track, and a sentence of time served with supervised release will enable him to stay on it.

Honorable Paul G. Gardephe July 28, 2022
United States District Judge Page 2

**Personal Background**

 Andrew Lawrence was one of three sons born to Crystal Lewis and Adrian Lawrence. He was born in May 1996 in the Bronx, New York, as their middle child.  His father left when he was approximately 5 years old and Mr. Lawrence has not seen him since then.  His mother writes: "Andrew grew up in a very sad and tough environment. He was about five years old when his father left us. His father was physically abusive to me, sometimes, in front of my children. So, I kicked him out of my house. We never saw him again." Exhibit C, Letter from Mother Crystal Lewis.

 In his father's absence, his mother and grandmother ("Mami Sue") did their best to raise Ms. Lewis' children (in addition to Mr. Lawrence and his 2 full siblings, Ms. Lewis also had another son who was 6 years older than Mr. Lawrence and later, in 2010, had twins who are now 12 years old).  Mr. Lawrence felt lucky to be loved by his mom and her relatives, but his mother makes clear that they struggled: "We moved between many different apartments in the Bronx… I wanted to protect my kids from the bad influences around us." Id.

 Mr. Lawrence's struggles persisted during his teen years: his peers bullied him for his weight – which was always high.  When he responded to these malicious taunts, the school placed him in special education to deal with his "anger issues."  Mr. Lawrence recalls that he did not have issues with anger; he just felt hurt and humiliated when he was teased.

 Mr. Lawrence was only 15 years old when he began using marijuana as a coping mechanism, and he also started getting into trouble as a teen.  He was adjudicated a youthful offender for a felony and sustained a non-violent misdemeanor conviction before his 18th birthday.  These early encounters with the criminal justice system derailed Mr. Lawrence's education, and he never graduated from high school.  When he turned 18, Mr. Lawrence was convicted of his first – and only before the instant case – adult felony, for attempted criminal possession of a controlled substance in the 3rd degree (he was present in a hotel room in which someone else was selling drugs).

 Fortunately, these mistakes – which were primarily made before his 19th birthday – do not wholly define Mr. Lawrence.  In 2018, Mr. Lawrence began a relationship with his current girlfriend, Khiabet Falu, and they have been together ever since.  Ms. Falu is gainfully employed as a security guard, has no criminal record, and is a very good influence on Mr. Lawrence.  "He has a very supportive partner in his corner, who wants to see him do well in life. Andrew wants the same thing too." Id.  They are excellent partners to one another: "We both had rough childhoods, but we are working to make a different life for ourselves and my son. We motivate each other and want the best of each other." Exhibit B, Letter from Khiabet Falu.

 When they met, Ms. Falu had a young son from another relationship,  Mr. Lawrence is the only father that ▮▮▮ (now 7) knows and Mr. Lawrence loves ▮▮▮ as his own son.  Mr. Lawrence can relate to ▮▮▮: "His biological father, like mine, is not very present in his life. I know that that harmed me in some ways…I want to be

the example for my son that I did not have growing up. I know that, with continual support and good example, our son will succeed and live a life far from the traps of the streets." Exhibit A, Letter from Andrew Lawrence.  Ms. Falu writes: "[Andrew] is the kind of person to go hungry just so my son and I could have a bite of food. He is caring and protective of me and my son. He is more of a father figure to my son than my son's own father."  Exhibit B, Letter from Girlfriend Khaibet Falu.  Mr. Lawrence is the person who takes ▮▮▮▮ to school. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ms. Falu's mother marvels at Mr. Lawrence's commitment to her daughter and grandson: "I love the man Andrew is becoming. For a boy who did not have the best male role models in his life, Andrew's care for his family—his son, my daughter, and me—is very admirable." Exhibit D, Letter from Mother-in-Law Marley Arce.

Mr. Lawrence is also a significant source of support for his other family members.  Mr. Lawrence had trouble maintaining employment outside of the home; he worked intermittently as an assistant janitor, as a security guard, and as a cashier.  Given this history, Mr. Lawrence was often home and available to his family.  "He is very helpful and kind to those around him. Andrew loves his family. He never wants to disappoint us."  Exhibit C, Letter from Mother Crystal Lewis.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Lawrence is one of the main people that his mother relies on to support the twins. (His grandmother, who helped raise Mr. Lawrence, is now 80 years old and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Offense Conduct**

Mr. Lawrence possessed a firearm in his jacket pocket, in the back of a taxi, on December 1, 2020.  He did not – nor is he accused of – using, brandishing, or even touching the gun in any way.  (Mr. Lawrence was stopped by the police because of a warrant for a

Honorable Paul G. Gardephe  July 28, 2022
United States District Judge  Page 4

misdemeanor assault case that did <u>not</u> involve a firearm.  The misdemeanor case was later dismissed.)[1]  Mr. Lawrence was a prohibited person at the time.

Mr. Lawrence immediately admitted his misconduct to the law enforcement officers who arrested him.  Specifically, he told the arresting officers that he had the gun for approximately two weeks and carried it for protection.  Indeed, the police officers who took his post-arrest statement agreed with Mr. Lawrence that that area was "hot" at the time.  "Until this case, I felt like I was walking on an eggshell. Because of my decisions, I always had the need to watch my back, fearing that someone was out to get me. This is why I was carrying the gun that got me in this trouble. I have no one to blame but me. I chose to hang around the people whose company made me feel the need to protect myself with a gun."  Exhibit A, Letter from Andrew Lawrence.

Mr. Lawrence accepts full responsibility for his crime.  "I made a terrible mistake. I have myself to blame for it."  <u>Id.</u>  In his letter to the Court, Mr. Lawrence offers "sincere apologies to you and my community."  <u>Id.</u>  He has expressed the same to his family: "Andrew is really sorry for his actions. He doesn't like how it has affected us emotionally and financially. He is working hard to prove to me that this will never happen again."  Exhibit B, Letter from Girlfriend Khaibet Falu.  "Andrew is very remorseful and takes full responsibility for his actions. I believe that he will never end up here again because I can already see the change in him."  Exhibit I, Letter from Friend Lashelle Mcdonald.

**<u>Guidelines Calculation</u>**

The parties and Probation agree that Mr. Lawrence has 2 criminal history points, placing him in Criminal History Category II.  <u>See</u> PSR ¶¶ 3, 35-36, 72.[2]

Pursuant to U.S.S.G. § 2K2.1, the base offense level in the instant case is 14.  <u>See</u> U.S.S.G. § 2K2.1(a)(6).  With two points subtracted for a timely acceptance of responsibility, the adjusted offense level is 12.  <u>See</u> U.S.S.G. § 3E1.1(a).  The resulting applicable guidelines range is 12 to 18 months imprisonment.

<u>The Government and Probation Used the Wrong Base Offense Level</u>

The government's <u>Pimentel</u> letter and Probation's PSR erroneously use a base offense level of 20, by claiming that Mr. Lawrence was previously convicted of a "controlled substance offense."  <u>See</u> PSR ¶¶ 3, 21.  They are wrong.  Mr. Lawrence's 2016 conviction for attempted

---

[1] Mr. Lawrence was originally arrested for the firearm in question by state authorities on December 1, 2020.  He was released.  He was presented in SDNY on January 29, 2021 and released on bail here as well.  The state case, for the same conduct as the instant offense, was later dismissed.

[2] As a typographical error, the Probation Officer erroneously wrote Category III in the PSR Recommendation.  <u>See</u> PSR, p. 18.

criminal possession of a controlled substance in the third degree, in violation of New York Penal Law § 110/220.16(1) does not qualify.

### Attempted Criminal Possession of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.16(1), is not a "controlled substance offense"

Mr. Lawrence's prior conviction is <u>not</u> a controlled substance offense for two reasons: (1) New York's definition of "narcotic drug" is broader than the federal drug schedule because New York includes certain isomers of cocaine that the federal schedule does not, and (2) New York's definition of "narcotic drug" is also broader because it includes naloxegol, which was deleted from the federal schedule in 2015. District courts have overwhelmingly agreed with Mr. Lawrence's position.[3]

A "controlled substance offense" is defined as: "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b).

In determining whether a prior New York state conviction counts as a "controlled substance offense," the Court must apply the categorical approach and compare the elements of the New York offense with the federal definition in U.S.S.G. § 4B1.2(b). See <u>United States v. Townsend</u>, 897 F.3d 66, 72 (2d Cir. 2018). The Court can look "only to the statutory definitions of the prior offenses, and not to particular facts underlying those convictions." <u>Taylor v. United States</u>, 495 U.S. 575, 600 (1990). A defendant's "actual conduct is irrelevant to the inquiry," and "the adjudicator must 'presume that the conviction rested upon nothing more than the least of the acts criminalized'" under the state statute. <u>Mellouli v. Lynch</u>, 135 S. Ct. 1980, 1985 (2015) (quoting <u>Moncrieffe v. Holder</u>, 133 S. Ct. 1678, 1684 (2013)). "If a state statute is broader than its federal counterpart – that is, if the state statute criminalizes some conduct that is not criminalized under the analogous federal law – the state conviction cannot support an increase in the base offense level." <u>Townsend</u>, 897 F.3d at 72. In other words, if the state statute "sweeps more broadly than the generic crime, a conviction under the law cannot count" as a § 4B1.2(b) predicate. See <u>Descamps v. United States</u>, 133 S. Ct. 2276, 2283 (2013).

In comparing the elements of Mr. Lawrence's prior New York State offenses and § 4B1.2(b)'s definition, this Court must apply <u>Townsend</u>'s holding: "[t]he term 'controlled substance' in [§ 4B1.2(b)] refers exclusively to those substances in the CSA [the Controlled Substances Act]." 897 F.3d at 75. If Mr. Lawrence "might have been convicted" under §

---

[3] The issue of overbreadth is currently pending before the Second Circuit in <u>United States v. Gibson</u>, No. 20-3049 (2d Cir.). The defendant won below, see <u>United States v. Gibson</u>, 19 Cr. 66, Dkt. No. 53 (W.D.N.Y. Jan. 31, 2020) (Vilardo, J.), and the appeal was brought by the government. <u>Gibson</u> was argued before the Circuit on November 23, 2021. No decision has issued.

Honorable Paul G. Gardephe                                              July 28, 2022
United States District Judge                                                  Page 6

110/220.16(1) "for conduct that is not prohibited by the CSA, his state conviction[s] cannot qualify as…predicated offense[s]." Id.

Applying this legal framework, Mr. Lawrence's prior New York State conviction is not a "controlled substance offense" because the State statute's prohibition on the attempted sale of "narcotic drugs" encompasses several substances not controlled under federal law.

> (1) New York's Definition of "Narcotic Drug" is Broader than the Federal Schedule because it Includes Certain Cocaine Isomers, which are Not on the Federal Schedule

New York Penal Law § 220.16(1) has, as an element, the possession with intent to sell "a narcotic drug" which, under New York State law, includes certain cocaine isomers that do not fall within the federal CSA. New York law controls:

> [c]oca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances including cocaine and ecgonine, their salts, isomers, and salts of isomers…

N.Y. Pub. Health L. § 3306, Sched. II(b)(4). The term "isomers" is not elsewhere defined, narrowed or restricted in New York law. Indeed, New York meant for its definition to include "cocaine and all of its isomers." See People v. Burnett, 666 N.Y.S.2d 658, 659 (App. Div. 2d. Dep't 1997) (emphasis added).

In contrast, federal law – which was enacted later in time – controls only the "optical or geometric" isomers of cocaine. 21 C.F.R. §§ 1300.01(b) (2021) (defining the term "isomer" as used in 21 C.F.R. § 1308.12(b)(4)). Indeed, Judge Castel recently found that "[t]here appears to me to be some intention on the part of the draft people of the Federal Regulation to make it different from the broader New York regulation." United States v. Louissaint, 20 Cr. 685, Dkt. No. 35 (S.D.N.Y. Nov. 17, 2021) (Castel, J.).

Accordingly, under the categorical approach, the fact that an indivisible element in the New York statute[4] is broader than its federal counterpart means that Mr. Lawrence's prior conviction is not considered a "controlled substance offense" under U.S.S.G. § 4B1.2.

---

[4] The statutory term "narcotic drug" in § 220.16(1) is indivisible because the identity of the particular "narcotic drug" sold is not an element on which a jury must agree. See Harbin v. Sessions, 860 F.3d 58, 67 (2d Cir. 2017) (discussing New York Appellate Division opinions "stat[ing] that different narcotic drugs do not create separate crimes under [N.Y. Penal Law § 220.16(1)], and that jurors need not agree as to the particular drug in question"); see also United States v. Savinon, 21 Cr. 233, Dkt. No. 25 (S.D.N.Y. Oct. 1, 2021) (Liman, J.) ("New York Penal Law 220.16(1) is indivisible in the sense the Second Circuit described it in Harbin."); Gov't Ltr., United States v. Ferrer, 17 Cr. 773, Dkt. No. 23 (S.D.N.Y. Oct. 17, 2018) (Koeltl, J.)

District Courts have reached this conclusion repeatedly. See, e.g., United States v. Gutierrez-Campos, 21 Cr. 40, Dkt. No. 60 (S.D.N.Y. Jan. 31, 2022) (Cronan, J.) ("This plain textual reading of the relevant federal regulations compels the conclusion that New York's definition of cocaine, without limitation to particular types of isomers, is categorically broader than the federal definition."); United States v. Louissaint, 20 Cr. 685, Dkt. No. 35 (S.D.N.Y. Nov. 17, 2021) (Castel, J.) ("So the question is does New York's definition control isomers of cocaine that federal law does not? And the answer to that question is yes. New York law, on the face of the statutory text, covers all isomers of cocaine, while federal law confines itself to optical or geometric isomers of cocaine."); United States v. Fernandez-Taveras, 511 F. Supp. 3d 367, 374 (E.D.N.Y. 2021) (Garaufis, J.) (concluding that "the New York statute applies on its face to cocaine isomers to which the [Controlled Substances Act] does not"); United States v. Baez- Medina, 20 Cr. 24, Dkt. No. 50 (S.D.N.Y. July 1, 2021) (Koeltl, J.); United States v. Ferrer, 20 Cr. 650, Dkt. No. 25 (S.D.N.Y. July 21, 2021) (Buchwald, J.); United States v. Minter, 20 Cr. 389, Dkt. No. 72 (S.D.N.Y. Oct. 12, 2021)[5] (Koeltl, J.); United States v. Hagood, 20 Cr. 656 (S.D.N.Y. Mar. 9, 2022)[6] (Engelmayer, J.) ("I find the New York law to be a categorical mismatch with the federal law: the New York law is broader.") In Hagood, in a sentencing just three months ago, Judge Engelmayer also noted: "In so finding, I join what appears to be a uniform bloc of judges in this district—in this circuit, indeed—who have encountered this issue." Id.

> (2) New York's Definition of "Narcotic Drug" is Broader than the Federal Schedule because it includes Naloxegol, which was Deleted from the Federal Schedule in 2015

Mr. Lawrence's prior state offense is also not "controlled substance offense" because New York State prohibits the sale of any derivative of opium or opiate, including naloxegol – a substance that, since 2015, is now explicitly excluded from the federal controlled substance schedule. Compare N.Y. Pub. Health Law § 3306, schedule II(b)(1) (defining "narcotic drug" to include "any … derivative … of opium or opiate") with 21 C.F.R. § 1308.12(b)(1) (excluding from the schedule naloxegol).

As with cocaine isomers, the inclusion of naloxegol on the state schedule and its exclusion from the federal schedule means that the statute of Mr. Lawrence's prior conviction is a categorical mismatch with U.S.S.G. § 4B1.2(b). Mr. Lawrence's state court arrest and conviction took place in 2015 – in the months following the deletion of naloxegol from the

---

("The Government agrees…that, pursuant to Harbin v. Sessions…the subsection[] criminalizing the sale… of [a] 'narcotic drug[]'—[is] not further divisible by type of narcotic drug.").

[5] The government filed a notice of appeal in Minter. See Dkt. No. 77.

[6] This Transcript is not yet available to the public on PACER. It can be provided to the Court.

federal schedule.[7]  In fact, until recently, the government conceded that convictions sustained by defendants for New York State narcotic offenses after naloxegol was removed from the federal controlled substances schedule did not qualify as "controlled substance offenses."  See, e.g., Gov't Sent. Ltr., United States v. Disla, 20 Cr. 222, Dkt. No. 23 (S.D.N.Y. Nov. 23, 2020) (Hellerstein, J.).  Several judges within this Circuit agree.  See, e.g., United States v. Savinon, 21 Cr. 233, Dkt. No. 25 (S.D.N.Y. Oct. 1, 2021) (Liman, J.); United States v. Galdieri, 19 Cr. 757, Dkt. No. 143 (S.D.N.Y. Oct. 5, 2021) (Furman, J.).[8]

Therefore, because Mr. Lawrence's state statute of prior conviction is a categorical mismatch with the federal definition – for both reasons described herein – and as the Courts have overwhelming already found: this Court should find that Mr. Lawrence's 2015 § 110/220.16(1) conviction is not a "controlled substance offense," and thus, cannot be used to increase his base offense level.

Thus, the properly-calculated guidelines range is 12 to 18 months.

**Appropriate Sentence**

A sentence of time served with supervised release will sufficiently satisfy the statutory goals of sentencing.[9]

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)."  United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013).  That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)."  Id.  "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation."  Id.  The guidelines, of course, are advisory and this Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented."  Gall v. United States,

---

[7] The federal schedule was modified on January 23, 2015.  Compare 21 C.F.R. § 1308.12 (enacted Jan. 23, 2015) with 21 C.F.R. § 1308.12 (enacted Jan. 27, 2012).  Mr. Lawrence was arrested for his prior state offense on March 26, 2015.

[8] A number of Courts in this District have also found a categorical mismatch when the prior N.Y. state conviction was incurred before the deletion of naloxegol, finding that the federal drug schedule in effect at the time of the sentencing applies.  See, e.g., United States v. Smith, 20 Cr. 317 (S.D.N.Y. Feb. 3, 2022) (Swain, J.); United States v. Butler, 19 Cr. 177, Dkt. No. 26 (S.D.N.Y. Feb. 12, 2020) (Daniels, J.); United States v. Augustine, 17 Cr. 753, Dkt. No. 332 (S.D.N.Y. Sept. 19, 2019) (Seibel, J.); United States v. Santana, 18 Cr. 865, Dkt. No. 43 (S.D.N.Y. Aug. 22, 2019) (Caproni, J.).

[9] This is the appropriate sentence even under the government and Probation's erroneously-calculated guidelines range.  Indeed, Probation recommended a significant downward variance from its incorrect range (12 months recommended; from a guidelines range of 27 to 33 months (and vis a vis a clear typographical error of 30-37 months).  See PSR, p. 18.

Honorable Paul G. Gardephe                                                                                        July 28, 2022
United States District Judge                                                                                              Page 9

552 U.S. 38, 50 (2007).  In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." <u>Pepper v. United States</u>, 562 U.S. 476, 487-88 (2011) (citations omitted).

<u>Mr. Lawrence has Already Disassociated Himself from the People and Neighborhood Where he Committed this Crime</u>

      After his arrest, Mr. Lawrence immediately chose to avoid the negative influences in his life: "My arrest was a great blessing in disguise. For the first time in my life, I have the time to be with my family, and not be on the street pretending to be a tough guy. I am not a tough guy. I had that gun on me because I was scared deep down in my heart." Exhibit A, Letter from Andrew Lawrence.  In his post-arrest statement, Mr. Lawrence pointed out that he was on the block where he possessed the gun "every day."  Today, that is no longer true.  He has broken those bonds and those patterns; he stopped hanging out in that area entirely.  He does not want to be that person any more.  "I no longer feel comfortable leading the life that got me in this trouble. I have no urge to be around the people with whom I had to pretend to be someone that I am not. I do not want to put myself in a position where I will need to have a gun on me for protection."  <u>Id.</u>

      The change is evident to those around him: "I have seen a big improvement in Andrew because of this case.  He doesn't keep many friends now.  He is barely outside unless he is going to training programs.  He is trying to stay away from all of the bad influences around.  He spends most of his time at home with our son and researching educational and employment opportunities.  His main focus right now is to get a job, help me with the bills, and start the process to move our family into an even better apartment."  Exhibit B, Letter from Girlfriend Khaibet Falu.

      Mr. Lawrence does not want to put his family in a position where they must pay for his mistakes: "I have been dealing with the consequences of those decisions for over a year now. My partner, our kid, and my larger family have suffered alongside me. It hurts me to know that my foolish decisions were the cause of their pain. I have vouched to them, as I am vouching to you now, that I will do better by them and myself. I will."  Exhibit A, Letter from Andrew Lawrence. He promises: "My plan [i]s to lead a quiet life with my partner and our son, start our own traditions and help each other succeed…"  <u>Id.</u>  His girlfriend shares this goal: "Since the beginning of our relationship Andrew always wanted to be a good example to my son, his stepson. Being arrested was a bad example. He has done everything he can to make up for his mistake. He is more motivated than ever before."  Exhibit B, Letter from Girlfriend Khaibet Falu.

<u>Mr. Lawrence's Arrest was a Sufficient Wake-Up Call</u>

      No jail time is necessary to achieve the statutory goals of sentencing in this case.  "I am sad that Andrew got arrested. In some ways, though, it's been a great thing for him. I have never seen him more motivated to better himself, work and take care of his family. He has been doing everything he is supposed to be doing and more."  Exhibit I, Letter from Friend Lashelle

Mcdonald.  His loved ones believe that this case has changed the trajectory of his life for the better: "Andrew made a bad mistake in this case, but I am proud of the man he is becoming because of the case. I do not approve of his action, and this case has been very hard for our family. But it has motivated Andrew like never before. He knows that he is no longer a child and that his actions have consequences."  Exhibit C, Letter from Mother Crystal Lewis.

"Andrew's transformation, since this case, has been a testament that he still has a bright future ahead of him. I know this because he and I have spent more time together in the last few months than ever before. Andrew has been my go-to person for pretty much everything I can no longer do for myself. His care for me has been unlike anything I have seen from him. This is a great improvement of his character, and I have no doubt that it will continue, given a chance. This Andrew is deserving of a second chance and, I am certain, with this great attitude, he can expect great things from the future."  Exhibit D, Letter from Mother-in-Law Marley Arce.

<u>Mr. Lawrence has Demonstrated that he Can Follow the Law and the Rules of the Court</u>

From the date of his arrest, Mr. Lawrence has committed himself to adhering to the law, following the terms of his supervision, and beginning a new, positive trajectory.  He has done so for more than 18 months at liberty with these charges pending.

This positive adjustment is confirmed by Officer Jonathan Lettieri, who reports that Mr. Lawrence has been fully compliant with the terms of his release.  <u>See</u> PSR, ¶ 5.  "Home arrest is not an easy thing, but Andrew is making the most of it. With a second chance, he will do even more with his freedom."  Exhibit I, Letter from Friend Lashelle Mcdonald.  In fact, in April, Officer Lettieri recommended that Mr. Lawrence's conditions be lessened from home detention to a curfew enforced by electronic monitoring.  <u>See</u> Dkt. No. 48.  Even with this additional freedom, Mr. Lawrence has continued to excel on bail.

Mr. Lawrence has followed all of the rules of his supervision, even when confronted with significant obstacles.  For example, "My building has been out of gas and heat since April. We have been spending more money on food than usual because we have not been able to cook as much."  Exhibit A, Letter from Andrew Lawrence.  And, he has stayed the course in the face of serious loss: ████████████████████████████████████████████████████████████ ████████████████████████████  These experiences made me realize that life is very short and that I needed to be present for the people that I love. I know that I can only be available to my loved ones if I am living a law-abiding life. That is what I plan to do."  <u>Id.</u>

Mr. Lawrence knows that showing the Court – rather than telling the Court – that he is going to change his life is what matters.  He writes: "I have been taking the necessary steps to rectify [my mistake]. I have learned my lesson. This is why I have not had any problems with my pretrial officer since my release."  <u>Id.</u>  He is committed to his self-improvement.

Mr. Lawrence has Taken Advantage of the Unique Opportunity Your Honor Gave Him

At his plea in December, the Court continued Mr. Lawrence's bail and in doing so, made it clear:

> [I]t's a very special opportunity that you have because you actually have the opportunity to demonstrate that you can be law abiding, that you can be productive, that you are interested in having a productive life…I hope you take advantage of it. I hope that when we see each other again on [the date of sentencing], there's a glowing record demonstrating that you can hold a job, that you are interested in getting your GED, and that you want to be a productive member of society, and you're not interested in committing any future criminal behavior… what I'm saying is you largely hold your future in your hands.

Plea Transcript, Dkt. No. 36.  Mr. Lawrence has used the last seven months to show Your Honor the type of future he wants to have.

Since his plea, Mr. Lawrence has graduated from the Focus Forward Project, which "provid[es] an educational curriculum focused on reentry for individuals charged with federal crime…[and] [t]he goal…is to provide participants with the confidence and practical tools to successfully move forward with their lives."  Exhibit G, Letter and Certificate from Focus Forward.[10]  The facilitators describe Mr. Lawrence as "an active participant in the program."  Id. "When Andrew talked about his goals, career aspirations, and commitment to be the best son, father and husband, it was evident that he is determined to stay on a good path going forward." Id.  The program leaders concluded: "From our experience with Andrew, we believe that he [has what] it takes to avoid returning to his ways of the past."  Id.

Mr. Lawrence has done everything in his power to comply with this Court's instructions to continue his education and seek gainful employment.  His mother writes: "Since his house arrest, Andrew has been trying very hard to find a job. Every week, he tells me about an interview that he did or that he is going to do. It makes me so happy to see my son maturing and following his dream."  Exhibit C, Letter from Mother Crystal Lewis.  Mr. Lawrence worked with Federal Defenders and Focus Forward to write his resume.  He used that resume to submit many job applications online, including at Panda Express, McDonald's, and various warehouses.  "He gets really excited when he gets a call about an interview. We spent hours preparing for the interviews. He asks me questions about my interviews, and I give him tips about how to answer certain questions. With his efforts, I know that sooner than later something will come through. Andrew is a different man. It makes me happy to see the person he is becoming… I know that he will get a job soon because he is very motivated."  Exhibit B, Letter from Girlfriend Khaibet Falu.

---

[10] Focus Forward Class Facilitator Claire Schultz intends to attend Mr. Lawrence's sentencing. If permitted by the Court, she wishes to make a brief address in support of Mr. Lawrence.

Honorable Paul G. Gardephe  July 28, 2022
United States District Judge  Page 12

Mr. Lawrence completed his 10-hour OSHA course at the beginning of 2022. Exhibit F, OSHA Certificate. He hopes to complete the next level, 30-hour course as well as complete his GED. (Both educational options will require him to save up money so he can afford the enrollment fees.) Mr. Lawrence knows that advancing his education will improve his job prospects in the future.

In April, Mr. Lawrence obtained a job as a caretaker for his mother-in-law. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Exhibit E, Letter from Dr. Tenore, MD. At that time, undersigned counsel asked to postpone Mr. Lawrence's sentencing so that he could start this new job and the Court could evaluate his performance. Mr. Lawrence has used every single day since then demonstrating to the Court, his family, and his community that he can be a productive, contributing member of society. Ms. Arce writes:

> Andrew has been helping me around the house. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ In the past, my insurance paid for home health aides to assist me, but these caregivers never equaled those of my loved ones. This is why it's been a great pleasure to have Andrew around. I know him; I know that he cares about my health and wellbeing. He is at my house at least five days a week—cleaning, getting my medications, and preparing my meals. He accompanies me to my doctor's appointments and encourages me to take walks around the neighborhood. His care and concern for my wellbeing have been a huge improvement for my emotional state and health. Without him, I could not go to the store, let alone carry heavy groceries home. I am very grateful for his help.

Exhibit D, Letter from Mother-in-Law Marley Arce. In addition to the physical and logistical help he provides, Mr. Lawrence has also brought joy to her life: "Before Andrew started helping me, I felt very lonely….But, now that Andrew is around, I do not." Id. "I get to see and spend more quality time with him and my grandson—my grandson loves coming to my house with Andrew…There are few pleasures like being present for such moments." Id.

For Mr. Lawrence, the feeling is mutual: "I love that I am able to help my mother-in-law. She is one of the kindest people that I have in my life. She has treated me like her own son since I started dating her daughter. She never fails to give me advice about improving myself. Being able to help her, therefore, means a lot to me." Exhibit A, Letter from Andrew Lawrence. Continuing to work for Ms. Arce will help Mr. Lawrence achieve the financial stability necessary for him to pursue further educational and vocational opportunities, and as a result, his job prospects will only improve.

Current Conditions and Mr. Lawrence's Health Make Prison Unduly Punitive.

Even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom," because prison "is a harsh environment, in

which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." United States v. Sayoc, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019).

The enduring pandemic, coupled with Mr. Lawrence's health conditions, makes any incarceratory sentence excessively harsh. We urge the Court to consider this new reality as it decides on the appropriate sentence. As Judge McMahon put it, "in ordinary circumstances, I would have probably felt it necessary…to send you away for a while. I'm not going to do that because of the circumstances in which we find ourselves…with conditions getting worse all over the country, to put you in and to break up another family and to put your life in danger in that way." United States v. Camacho, 19 Cr. 389 (CM), Dkt. No. 77 (Dec. 18, 2020); see also United States v. Cirino, 19 Cr. 323 (JSR) (July 17, 2020) ("[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."); United States v. Diaz, 20 Cr. 305 (DLC), Dkt. No. 52 (Feb. 25, 2021) (recognizing the "circumstances…[of] incarcerat[ion] are harsh and unusual because of the pandemic. I am going to take that into account in determining what sentence to impose."). Judge Engelmayer recently explained: "Prison is uniquely hard these days." United States v. Hagood, 20 Cr. 646 (PAE), Dkt. No. 63 (Nov. 11, 2021). "There are all sorts of restrictions on access to family, on access to counsel, on access to telephones, on access sometimes to legal materials, and it's a much harder experience[.] I've seen this in case after case during COVID." Id.

During the pandemic, people in federal prisons have lived with unprecedented conditions: lockdowns and lock-ins have become commonplace. Such restrictions deprive people of the most basic tools that were traditionally used to promote their sanity and rehabilitation: visits, hot food, regular exercise, and educational programming. As a result, every day of incarceration in the federal system is harsher than it used to be. We urge the Court to consider this new reality as it decides on the appropriate sentence.

Unfortunately, the pandemic is far from over.[11] 

---

[11] See L. Leatherby, "What the BA.5 Subvariant Could Mean for the United States," N.Y. Times (July 7, 2022), available at https://www.nytimes.com/interactive/2022/07/07/us/ba5-covid-omicron-subvariant.html.

[12] See CDC "Science Brief: Evidence Used to Update the List of Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19" Webpage, available at https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html.

A Time Served Sentence Will Prevent Unwarranted Disparities

In 2021, this district sentenced 99 firearms cases, and 66.7% of those defendants received a sentence below their advisory Guideline range. See Table 10, U.S.S.C., Statistical Information Packet, Fiscal Year 2021.[13]

Sentences of time served have been imposed in many gun cases in this district. Such sentences are most common in cases like Mr. Lawrence's, where the defendant has been charged with possession of a weapon and is not accused of doing anything with it. See, e.g., United States v. Minaya, 19 Cr. 487 (CM), Dkt. Nos. 30, 31 (Oct. 14, 2021) (time served (no jail time) followed by three years supervised release); United States v. Figueroa, 18 Cr. 293 (ER), Dkt. No. 44 (Apr. 17, 2019) (time served (no jail time) followed by one year home detention and three years supervised release); United States v. Mouzon, 16 Cr. 284 (CM), Dkt. No. 53 (Mar. 27, 2017) (time served (no jail) with 18 months home detention as part of three years of supervised release); United States v. Garcia, 18 Cr. 178 (AT), Dkt. No. 50 (Mar. 7, 2019) (time served (no jail time) with inpatient treatment and three years of supervised release); United States v. Goodman, 16 Cr. 693 (PGG), Dkt. No. 20 (Feb. 10, 2017) (time served (no jail time) with two years of supervised release including community service); United States v. Sanchez, 17 Cr. 303 (VM) Dkt. Nos. 5, 22 (Oct. 24, 2017) (time served (no jail time) followed by seven months home confinement and three years supervised release).

Time Served and Supervised Release will Enable Mr. Lawrence to Continue His Positive Trajectory

The continued restraints imposed by supervised release will adequately deter Mr. Lawrence while allowing him to stay on his path towards rehabilitation. "Offenders on probation are…subject to several standard conditions that substantially restrict their liberty." Gall, 552 U.S. at 48; see also id. n.4 ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society") (internal citations omitted). The United States Probation Department will closely monitor his progress – as Pretrial Services has done for the last 18 months – to ensure that he remains on the right path.

The Court has Non-Incarceratory Tools at its Disposal to Further the Statutory Goals of Sentencing

The Court could require Mr. Lawrence to continue to wearing his ankle bracelet for a term of months as a condition of his supervised release, which would keep him on a strict schedule and monitor his movements. In addition, the Court could impose a community service obligation. Such an obligation would further remind him – during each minute of his service – of the lesson he should take from this prosecution: do not commit a crime again. Specifically, requiring Mr. Lawrence to do his service at a community-based anti-violence organization would be a well-tailored resolution for the instant offense.

---

[13] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/nys21.pdf.

Honorable Paul G. Gardephe                                                           July 28, 2022
United States District Judge                                                              Page 15

      For example, Save Our Streets (S.O.S.) South Bronx is located in Mr. Lawrence's neighborhood and they are committed to the goal of "end[ing] gun violence at the neighborhood level by changing local norms."[14] Mr. Lawrence can share his story with others to show the negative consequences that guns can have on a person's life. What better way to atone for a gun crime than helping to keep guns off the same streets? What better way to teach lessons of deterrence and rehabilitation?

<u>The Requested Sentence will Enable Mr. Lawrence to Give and Receive Support to and from his Family</u>

      "It would be a huge help to our family if Andrew is allowed to be home with us and work." Exhibit B, Letter from Girlfriend Khiabet Falu. The family he is building with Ms. Falu, and the family he was born into, both need him. "He has a partner, who is hardworking and inspiring, and a young boy who looks up to him. Andrew wants to be there for them." Exhibit C, Letter from Mother Crystal Lewis. To put Mr. Lawrence in jail at this juncture, would deprive ▓▓▓ of his father, Ms. Falu of her partner, Ms. Arce of her caretaker, and his mother of her most reliable helper and son. Incarceration would needlessly fracture the pro-social relationships that Mr. Lawrence has already built.

      This community will also enable Mr. Lawrence to succeed on a positive, law-abiding path. "We will work together to create a better life for us and our son. I believe in Andrew, and I will continue to support him in any way that I need to to help him achieve his goals." Exhibit B, Letter from Girlfriend Khiabet Falu. "His partner and I will be on his back to make sure that he stays on this good path. He knows he cannot afford to do anything like this again." Exhibit C, Letter from Mother Crystal Lewis. "As his friend, I am here to help and guide him to a positive path…I am happy to help Andrew because, deep down, I know he would not hesitate to help me in my times of need." Exhibit H, Letter from Friend Furman Starr. "Despite the current case, I still believe that Andrew is an honorable individual, a valuable member of his family and community and a good human being. He can and he will do better. I am here to support him." Exhibit I, Letter from Friend Lashelle Mcdonald.

**<u>Conclusion</u>**

      For all of these reasons, a sentence of time served with supervised release is sufficient to achieve the statutory goals of sentencing and consistent with the interests of justice.

Respectfully submitted,
/s/
Sylvie Levine
Counsel for Andrew Lawrence

---

[14] <u>See</u> Save Our Streets (S.O.S.), https://www.courtinnovation.org/programs/save-our-streets-sos/more-info; Kemberly Richardson, Bronx Anti-Violence Organization Aims to Prevent Shootings, Put Kids on the Right Path, ABC7 New York News (Jan. 24, 2022), https://abc7ny.com/save-our-streets-gun-violence-community-outreachbronx/11505526/.